IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RICHARD L. LACY,                    )
                                    )
            Plaintiff,              )
                                    )
    v.                              )        CIVIL ACTION NO. 2:10CV847-SRW
                                    )                 (WO)
MICHAEL J. ASTRUE, Commissioner     )
of Social Security,                 )
                                    )
            Defendant.              )

## MEMORANDUM OF OPINION

Plaintiff Richard L. Lacy brings this action pursuant to 42 U.S.C. § 405(g) and

§ 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security

("Commissioner") denying his application for disability insurance benefits and supplemental

security income under the Social Security Act.  The parties have consented to entry of final

judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c).  Upon review of the

record and briefs submitted by the parties, the court concludes that the decision of the

Commissioner is due to be affirmed.

## BACKGROUND

Plaintiff completed high school in 1972.  He reported past work as a helper at R.C.

Cola from June 1976 through June 1977, as a dental technician for the U.S. Air Force from

June 1978 through June 1986, as a route driver for Sun Ray Cleaners from October 1987

through October 1988, as a civil service dental technician from October 1988 through July

1992, and as a grocery store stock clerk from April through November of 2002.[1]   In August 2005, plaintiff filed the present applications for disability insurance benefits and supplemental security income,[2] alleging that he became disabled on July 15, 1999, due to "Back, osteoarthritis, osteomy[e]litis, migrain[e] headaches, knee, severe peripheral neuropathy - sensory type, hepatitis c, hypothyroidism, degenerative joint disease, wedge compression L1, depression, schizophrenia."  (R. 55-59, 121-22, 126, 128, 186).

The ALJ rendered a decision on May 21, 2008.  He found that plaintiff has "severe" impairments of "chronic obstructive pulmonary disease, headaches, hepatitis C, hypothyroidism, post operative bilateral bunions, mild degenerative arthritis in the knee(s), intermittent back strain, peripheral neuropathy, status post left arm/hand and left leg fractures, attention deficit disorder, depression, anxiety, personality disorder, and a history of substance abuse."  (R. 19).  He concluded that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the impairments in the "listings" and, further, that plaintiff retains the residual functional capacity to perform the exertional requirements of light work, with additional non-exertional

_____

[1]   Plaintiff reported that he stopped working in July 1999 because of his condition but, also, that he worked at a grocery store from April 2002 through November 2002. (See R. 122). His medical record indicates that he worked at various jobs after his alleged onset date. (See Exhibit 6F, Dr. Patel's notes indicating that plaintiff was holding jobs in 1999 and 2000).  The ALJ concluded that plaintiff's jobs after his alleged onset date were not at a substantial gainful activity level.  (R. 19).

[2]   The court did not locate the Title XVI application or initial decision in the record. However, plaintiff's notice of appeal to the ALJ reflects that he was appealing from initial administrative decisions under both Title II and Title XVI, the ALJ's hearing notice reflected that a Title XVI application was before him,  the ALJ's decision pertained to both claims, and the Appeals Council's denial of review cites both Title II and Title XVI.  (See R. 9, 17, 38, 45).

limitations.  (R. 20).  He concluded that plaintiff is unable to perform his past relevant work as a grocery store stock clerk and bagger, but that there are a significant number of jobs in the national economy that the plaintiff can perform. (R. 34-35).  The ALJ determined that plaintiff has not been under a disability as defined in the Social Security Act from his alleged onset date through the date of the decision. (R. 36). On August 10, 2010, the Appeals Council denied plaintiff's request for review (R. 7-10) and, accordingly, the decision of the ALJ stands as the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings.  Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).  Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court.  The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985 F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

**DISCUSSION**

Plaintiff contends that "[t]he Commissioner's decision should be reversed because the ALJ failed to properly apply the two part 'pain standard'." (Plaintiff's Brief, Doc. # 12, p. 7 (Statement of the Issue)). Plaintiff asserts that the ALJ erred in applying the Eleventh Circuit pain standard "in a number of ways: finding that there was no impairment capable of causing peripheral neuropathy when peripheral neuropathy had already been proven by objective means, finding that [plaintiff's] complaint of back pain were []solely for the purpose of obtaining narcotics when multiple objective tests (e.g. straight leg raise) indicate a severe back impairment, and misinterpreting [plaintiff's] testimony regarding his treatment for migraine headaches while indicating that said treatment was merely 'to obtain narcotics.'" (Plaintiff's brief, Doc. # 12, p. 14).

In the Eleventh Circuit, a claimant's assertion of disability through testimony of pain or other subjective symptoms is evaluated pursuant to a three-part standard. "The pain standard requires '(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005)(quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)).  If this standard is met, the ALJ must consider the testimony regarding the claimant's subjective symptoms.  Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992).  Although the ALJ is required to consider the testimony, the ALJ is not required to accept the testimony as true; the ALJ may reject the claimant's subjective complaints.  However, if the testimony is critical,

the ALJ must articulate specific reasons for rejecting the testimony.  Id.[3]  "The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole."  Dyer, supra, 395 F.3d at 1210 (citations and internal quotation marks omitted).

In the present case, the ALJ concluded that the evidence satisfied the requirements of the pain standard, i.e., "that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms[.]" (R. 22).  However, he determined that plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms" were not fully credible.  (Id.).  As he is required to do in these circumstances, the ALJ articulated his reasons for discounting plaintiff's testimony of disabling symptoms including, inter alia, his testimony regarding the effects of peripheral neuropathy (R. 22-23), chronic severe back pain (R. 23-25), and severe and frequent symptoms from migraine

---

[3]  See also Social Security Ruling 96-7p, 61 Fed. Reg. 34483-01 (July 2, 1996):

When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.  The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

headaches (R. 26-27).[4]

Peripheral Neuropathy

During the February 2008 administrative hearing, plaintiff testified that he cannot run without falling down due to peripheral neuropathy in his legs, and that he does not have any strength or feeling in his legs. He stated that his neuropathy causes him to have "really severe cramps" in his legs, and that he has to "get out of bed and usually fall to the floor and massage them out." (R. 2198-99). He further testified that he can stand "maybe about 10 minutes" and that "[a]nything longer than that, you know, when I'm not looking down at my feet I get kind of wobbly because I can't feel anything." (R. 2201). He testified that he has to "lay down for at least a few hours every single day" due to his back and leg pain, that his legs are numb and he "can't walk anymore." (R. 2202).

The ALJ concluded that plaintiff suffers from a severe impairment of "peripheral neuropathy." (R.19). He did not credit plaintiff's testimony regarding the severity of his symptoms fully, however, concluding that the "objective evidence does not support plaintiff's allegations" that he lacks strength and feeling in his legs and feet, requiring that he lie down during the day. (R. 22). The ALJ reasoned:

> On May 23, 1985, [claimant] had complained to his doctor of left hand numbness secondary to a childhood fracture and lower left leg numbness secondary to a tibial fracture resulting from a motorcycle accident in 1974 (Exhibit 2F). It is possible that such injuries may have resulted in some nerve damage. The medical record does contain an electromyogram (EMG), conducted in January of 2004, which demonstrates severe neuropathy of the

---

[4] The court discusses only the conclusions alleged by plaintiff to demonstrate reversible error and the evidence relevant to those conclusions.

*sensory* component of the nerves of the *left arm or left upper extremity*. The *motor* component of the nerves, however, was normal (Exhibit 9F). There is no EMG study of the legs or feet. Though the claimant may experience some diminished sensation in his left arm and left leg, he maintains good motor functioning in these extremities. Clinical findings have shown full function of the wrist and finger extensors, and only "mild," if any, weakness in the left leg (Exhibits 9F, 17F). X-rays, taken of the left tibia in April of 2007, have revealed an old healed fracture with "mild" soft tissue swelling near the fracture site (Exhibit 16F). This soft tissue swelling was a skin abscess treated with antibiotics (Exhibit 15F).

(R. 22)(emphasis in original). The ALJ further stated:

There are no impairments which would explain the alleged weakness and numbness **in the right leg**. The claimant has no disease processes, such as diabetes mellitus, Guillain-Barre syndrome or cancer, no history of exposure to toxic substances, no chronic alcoholism, and no significant nutritional deficiencies, all of which can cause peripheral neuropathy. In a recent consultative examination, conducted in August 2007, Dr. Colley observed the claimant to have good range of motion of his peripheral joints, normal muscle tone and bulk, no muscle atrophy, normal strength (5+/5) in all extremities, the ability of his fingers to normally abduct and adduct and make a fist, normal station, normal gait, and normal coordination. The claimant did not use an assistive device for balance or ambulation (Exhibit 17F).

(R. 22-23)(emphasis added)(footnotes omitted).

Plaintiff argues that "[t]he medical evidence of record clearly confirms that [plaintiff] suffers from peripheral neuropathy." (Doc. # 12, p. 9). He points to evidence that he has complained of, and has been diagnosed with, peripheral neuropathy on various occasions between 2001 and 2004. (Id., pp. 9-10). As noted above, while the ALJ did not credit plaintiff's allegations of symptoms of peripheral neuropathy fully, the ALJ did conclude that plaintiff has a severe impairment of peripheral neuropathy and that he "may experience some diminished sensation in his left arm and left leg." (R. 19, 22).

Plaintiff points to evidence that, in July 2001, he complained of "num[b]ness in legs and hand. Left side worse than right." The examining physician, Dr. Rajamannar, observed that plaintiff "[m]oved all 4 limbs freely and with purpose" but also noted that he "[u]nderwent NCV testing which showed findings consist[e]nt with Neuropathy." (See Plaintiff's brief, p. 9; R. 1349). Plaintiff also cites Dr. Rajamannar's observation a few months later that plaintiff "had a NCV done in July which showed Peripheral Neuropathy – cause of which could be the chronic use of codeine since he is not a diabetic or does not use ETOH." (Plaintiff's brief, p. 10)(citing R. 1253). Dr. Rajamannar's notes do not indicate which of plaintiff's four limbs were tested by nerve conduction velocity studies, and the July 2001 NCV report does not appear in the record. Also, although Dr. Rajamannar diagnosed peripheral neuropathy, his notes do not indicate one way or the other whether Dr. Rajamannar determined through examination or testing that the condition existed as to plaintiff's right leg. (R. 1253, 1349).[5] In January 2004, as plaintiff notes, he had EMG/NCV testing on his left arm. (Plaintiff's brief, p. 10; R. 784). The ALJ acknowledged this study, noting that it demonstrated severe neuropathy of the sensory component of the nerves of plaintiff's left upper extremity and no abnormality in the motor component. (R. 22; R. 784).

Plaintiff also cites a letter written by a psychiatric nurse practitioner, addressed "to whom it may concern" regarding plaintiff's low back pain and peripheral neuropathy. Nurse

---

[5] Plaintiff also points to a 2001 diagnosis of peripheral neuropathy by Gloria Brown, a VA kinesiotherapist. (Plaintiff's brief, p. 9)(citing R. 1272). For purposes of establishing the existence of an impairment, a kinesiotherapist is not an acceptable medical source. See 20 C.F.R. § 416.913(a). Ms. Brown observed the range of motion of all four extremities to be within normal limits, bilateral lower extremity strength of 4/5 and that plaintiff was able to ambulate independently on all surfaces. (R. 1273).

Moon reports the result of plaintiff's January 2004 EMG; she further indicates that plaintiff "also had had EMG studies in 1997 and 2001 and those tests also confirmed peripheral neuropathy."   (Plaintiff's brief, p. 11; R. 614).  However, Moon gives no additional information regarding the 1997 and 2001 EMG studies.  (R. 614-16).

Plaintiff contends that "the argument that Mr. Lacy cannot have peripheral neuropathy because he has no condition that would cause it is moot.  Some impairment must cause the peripheral neuropathy, as it has been proven by objective testing." (Plaintiff's brief, p. 10).  However, as discussed above, the single nerve conduction study described in any detail in the voluminous record tested only plaintiff's left arm.  While plaintiff has cited references to other EMG or NCV studies in 1999 and 2001, those references do not indicate what the objective testing revealed as to plaintiff's right leg or, even whether the nerves of his right leg were tested.  In a March 2002 consultative disability examination, Dr. Roundtree concluded that plaintiff "does have peripheral neuropathy in that he complains of numbness in both toes." (R. 428).  However, Dr. Roundtree found plaintiff's range of motion of all joints to be normal, the strength of plaintiff's upper and lower extremities to be normal with no atrophy, his fine and gross coordination of his upper extremities to be normal with no functional impairment, and normal gait and station.  (R. 429-32). The ALJ found plaintiff to suffer from peripheral neuropathy and credited plaintiff's allegations of symptoms arising from peripheral neuropathy, but not to the extent alleged by plaintiff and not as to the alleged weakness and numbness in plaintiff's right leg. The ALJ noted clinical findings in the most recent consultative examination showing good range of motion of plaintiff's peripheral joints,

normal muscle tone and bulk, no muscle atrophy, normal strength (5+/5) in all extremities, the ability of his fingers to normally abduct and adduct and make a fist, normal station, normal gait, and normal coordination.  (R. 23)(citing Exhibit 17F (R. 2032-41)).  He also relied on the hearing testimony of the medical expert.  (See R. 27; R. 2209).[6]

Thus, the reasons articulated by the ALJ for discounting plaintiff's testimony that he must lie down during the day due to the lack of strength and feeling in his legs and feet are, on the whole, both adequate and supported by substantial evidence of record.

## Back Impairment

The ALJ found that plaintiff suffers from intermittent back strain. He concluded, however, that "[i]n terms of claimant's alleged lower back pain which requires he lie down every day, the undersigned finds very little medical evidence of a chronic impairment to which his back pain can be reasonably related." (R. 23)  The ALJ noted clinical findings associated with lumbar strain of muscle spasm or tenderness in the lumbar region with limited range of motion in May 1994, in August 2000 (after plaintiff fell down some steps) and in February 2007 (after plaintiff reported slipping on the steps while climbing down from a bunk bed).

---

[6]  The medical expert, Dr. Evans, testified as follows:

[G]oing through the records I could not find definite verification of a peripheral neuropathy *in the legs*.  There was an EMG that showed some sensory deficit in the left upper extremity I believe it was but I never did see a definite EMG or NCVs that verified the peripheral neuropathy *in the legs* and so, and in addition to that other than one exhibit that said he had slight weakness of the left leg [on 6-8-01] there is nothing in the records that indicate[s] there's loss of strength or loss of mobility or loss of sensation.

(R. 2209)(emphasis added).  Dr. Evans acknowledged that he saw diagnoses of neuropathy in the record but that he saw no verification of such diagnoses by objective studies or significant physical findings. (Id.).

(R. 23). The ALJ observed, however, that "diagnostic testing has failed to confirm a significant back impairment." (Id.) The ALJ cited a lumbar spine x-ray in August of 2000 revealing mild diffuse osteopenia and minimal wedge compression of the L1 body, coded by the VA as a "minor abnormality." He also noted a December 2000 lumbar spine CT that was "normal"; January 2002 and November 2004 lumbar spine x-rays that were also "normal" or "essentially normal"; and plaintiff's February 2007 lumbar spine x-ray, taken after plaintiff had slipped from the steps while getting down from his bed, showing "some straightening of the normal lordosis consistent with muscle strain; otherwise, lumbar vertebral body heights and alignment were normal with no fractures or dislocations." (R. 23). The ALJ's observations regarding this diagnostic testing are supported by the record. (See R. 1430, 1556, 1575, 1582, 1583, 1762; see also R. 1628 (March 2006 normal lumbar spine x-rays)).

The ALJ further reasoned that, while plaintiff had "regularly reported back pain to his doctors[,]" the record "strongly suggests that many such complaints were made, not because of disabling, unrelenting pain, but solely for the purpose of obtaining narcotics." (R. 23). The ALJ notes that the "record is replete with instances of drug seeking behavior[.]" (Id.). Then – in a description spanning nearly three pages of his single-spaced decision – he sets forth the portions of the medical record supporting his conclusion in this regard. The ALJ notes instances of plaintiff's seeking early refills of narcotic medication; plaintiff's report that he spent $2700 on cocaine after receiving an increase in his VA disability benefit; a positive drug screen a few months thereafter for cocaine; plaintiff's doctor's conclusion in 2000 that even though plaintiff had lumbar pain, the doctor believed that plaintiff's narcotic addiction was

the main problem; plaintiff's repeated failures to appear for appointments scheduled for him by the VA for the pain management clinic; plaintiff's discharge from the pain clinic for refusing to take a urine drug screen and offering Percocet to other participants; his readmission to the pain clinic and discharge after a few days for use of unauthorized medications; physicians' observations of plaintiff's behavior and activity that were inconsistent with his reports of severe pain; plaintiff's refusal of non-narcotic anti-inflammatory medications for his pain; his physician's conclusion that plaintiff was abusing his narcotic prescription medications; and plaintiff's conduct in obtaining narcotics from the ER or non-VA physicians while he was also being treated and prescribed narcotics by VA providers.  (R. 23-26).  The court will not summarize the entire record on which the ALJ relied here.  However, the ALJ's conclusion that many of plaintiff's reports of pain to his doctors were not made due to severe pain but, instead, for the purpose of obtaining narcotics, is well-supported by the medical record.  (See R. 446, 469, 553, 769-70, 869, 1079-80, 1184-1208, 1222, 1236-37, 1240, 1274, 1300, 1302-03, 1306-07, 1309, 1313, 1318, 1324, 1333, 1341, 1353-54, 1356, 1361, 1366, 1370,1388-89, 1392-95, 1404, 1416, 1436, 1440, 1443, 1457-59, 1460, 1645, 1658, 1661, 1668, 1693, 1700, 1718, 1730, 1742, 1751, 1833, 1835, 1858, 1880, 1893, 1907, 1915).

Plaintiff points, again, to psychiatric nurse practitioner Moon's letter in which she reports plaintiff's diagnoses of "DDD (degenerative disc disease), spondylosis, wedge compression at L1, and lumbago." He also cites a diagnosis by Dr. Colley, in a consultative examination in 2007" of "degenerative disk disease of the lumbosacral spine with bilateral

lumbar radiculitis/possible radiculopathy at L5-S1" and "possible right sacroiliitis." (Plaintiff's brief, p. 11). Plaintiff argues that the ALJ "should have taken into account [his] longitudinal history of complaints and attempts at relief before issuing a negative credibility finding" and that his physicians' continued prescriptions for narcotic pain medication indicate that his impairments are of a nature to require such medication. (Id., pp. 11-13). While Dr. Colley noted that plaintiff had pain and tenderness on examination, Dr. Colley also observed that plaintiff "had questionable consistency and gave questionable effort" and that "he appeared comfortable and in no acute distress[,]" had a normal gait and "had no problems standing up and getting on the examination table." (R. 2037). The records provided to Dr. Colley for his review included only a March 2006 pulmonary function study, a report of a previous consultative examination in January 2006, and March 1, 2006 x-rays of the lumbosacral spine, which Dr. Colley described as "normal." (R. 2032). Plaintiff told Dr. Colley during the examination that "he has had magnetic resonance imaging of the lumbosacral spine which revealed a 'compressed disk at L4-L5" as well as a 2003 hospitalization in Florida for "complete paralysis of both lower extremities" which lasted for one to two weeks. (R. 2033). The MRI described by the plaintiff to Dr. Colley is not included in the administrative transcript,[7] nor is the record of plaintiff's lengthy hospitalization in Florida for paralysis of both legs.

   In addition to finding plaintiff's complaints of debilitating back pain to be less than

---

[7] Plaintiff was twice scheduled for a lumbar spine MRI in 2001, but he failed to keep the appointments. (R. 1392).

fully credible because plaintiff's record suggested that many of his pain complaints to medical providers were motivated by his narcotic addiction rather than by "disabling, unrelenting pain," the ALJ also relied on the failure of diagnostic testing to show a significant back impairment.  He relied, in part, on the medical expert's testimony, based on his review of all of the medical evidence of record, that the CT and x-rays taken of plaintiff's lumbar spine have been normal, that plaintiff suffers from low back pain with no specific diagnosis, and that plaintiff is capable of performing the exertional requirements of light work.  (R. 27-28, 33; see R. 2207-10; see also VA records (most often assessing low back pain or chronic back pain rather than a specific back impairment when plaintiff reported back pain)).  While plaintiff presents his "longitudinal history of complaints" as indicative of debilitating pain, the record supports the ALJ's conclusion that plaintiff's "longitudinal history" includes many complaints motivated by plaintiff's narcotic addiction rather than by pain.  Whether or not the ALJ might have reached a different conclusion, the reasons articulated by the ALJ for discrediting plaintiff's allegations of debilitating back pain are both adequate and supported by substantial evidence of record.

<u>Migraine Headaches</u>

Regarding plaintiff's headaches, the ALJ reasoned:

Claimant's allegation that he has five to seven migraine headaches a month is not generally supported by the objective evidence.  In years 1985 and 1986, he was experiencing frequent tension headaches due to marital discord.  His headaches ceased for a time after he obtained a divorce.  Then, in the year 1992, his doctor prescribed Fiorinal for headaches; this medication was later changed to Esgic.  VAMC records contain very few headache complaints while the claimant remained on these medications.  Progress notes, dated December 9,

2003, state that the claimant had left his work site secondary to a headache. He reported having a headache once a month and that he would be ifnd once he got home and took his medication. Later that day, on his request, he was allowed to return to work (Exhibits 2F, 9F). Progress notes, dated February 5, 2007, state that the claimant wanted to stop taking Esgic because it was not helping him. They do not mention whether a request for another medication was made (Exhibit 16F).

At the disability hearing, the claimant testified that he now visits the emergency room (ER) for a shot when he has a headache. Though he claims to have several headaches per month, the treatment record contains only two ER visits for head pain: on May 11, 2007 and May 12, 2007. During those visits the claimant received Percocet (Exhibit 15F). The undersigned questions whether the claimant was in fact experiencing disabling headaches during those ER visits or whether he was attempting to obtain narcotics. In the first part of 2007, the claimant made numerous visits to the hospital ER (outside the VAMC) for various complaints and received narcotics – in addition to the MS Contin and Hydrocodone prescribed at the VAMC (Exhibits 15F, 16F). Once again, this evidence strongly suggests drug seeking behavior in this case.

The treatment record contains no ER visits for head pain after May of 2007. (R. 26-27).

Plaintiff contends that the ALJ misinterpreted his hearing testimony when he stated that "the claimant testified that he now visits the emergency room (ER) for a shot when he has a headache." (Plaintiff's brief, p. 14)(citing R. 26). He protests that he "never made this statement" but testified, instead, that "depending on, you know, stress and worry they're the kind of headaches where I have to go to the hospital." (Id.)(citing R. 2204). He argues that whether he sought medical treatment "depended on stress and worry" and there are instances in which he did not seek treatment. (Id.).

The ALJ's summary of the testimony does not purport to be verbatim, and is sometimes imprecise. Plaintiff's direct quotation of the testimony is not wholly accurate either, as he substitutes the word "hospital" for "emergency room" in his brief. Plaintiff testified as

follows:

> Q.  What about the headaches you had mentioned?  Do you still have problems with that?
>
> A.  Yes, sir, I do.  Sometimes I'll have five, six, seven a month, you know, and depending on, you know, stress and worry they're the kind of headaches where I have to go to the emergency room.  You know, it's not, I can't take something or the medicine I already take doesn't do anything for me.  I have to go get a shot or I've come to know what helps me and I tell the doctor.
>
> *   *   *   *   *
>
> Q. And how long do they generally last?
>
> A.  If I don't seek some treatment a good three days.  It lasts three, four days, longer you know.

(R. 2204).

Plaintiff's testimony may reasonably be understood to mean that his headaches – when exacerbated by "stress and worry" – are severe enough to cause him to seek treatment at the emergency room.  Plaintiff reads the ALJ's summary to indicate that plaintiff testified that he seeks emergency room treatment *every time* he has a headache.  While the ALJ's description of the testimony could have been clearer, his summary appears to reflect the ALJ's understanding that plaintiff, when he has a headache severe enough to require treatment, seeks it at the emergency room.  Even if the ALJ's recitation of the testimony is not exactly as plaintiff testified, the critical point in his analysis is that plaintiff sought treatment for head pain at the emergency room only on May 11 and 12, 2007, and the record did not reflect that he did so again in the nine months between May 2007 and the hearing.  Plaintiff does not dispute the accuracy of this part of the analysis, and it is a fair consideration in assessing the

16

credibility of plaintiff's complaints.

Plaintiff also contends that the ALJ erred by "question[ing] whether the claimant was in fact experiencing disabling headaches during those [May 11 and 12] ER visits or whether he was attempting to obtain narcotics." (R. 27; Plaintiff's brief, Doc. # 12, p. 13).  However, as set forth above, the ALJ relied on evidence that "in the first part of 2007, the claimant made numerous visits to the hospital ER (outside the VAMC) for various complaints and received narcotics – in addition to the MS Contin and Hydrocodone prescribed at the VAMC." (R. 27). The plaintiff describes this conclusion as "incorrect" but does not discuss the evidence on which the ALJ relied in reaching it.  (Doc. # 12, p. 13).  The court concludes that the evidence cited by the ALJ – plaintiff's history of treatment at the Baptist ER and the VA during the first part of 2007 – provides substantial evidentiary support for his conclusion.

On February 5, 2007, plaintiff received a prescription for Hydrocodone 10 mg from the VAMC to be taken three times daily; plaintiff had received enough Lortab pills at the end of January to last him until the end of February, taken at the prescribed frequency.  (R. 1907, 1915).  The following morning, on February 6, 2007, plaintiff went to the Baptist ER complaining that he had slipped off of the stairs and "reinjured previous rib fractures." (R. 1754).  He refused the Motrin 800 mg  prescribed initially by the physician and said he would just go to another hospital for his pain.  (R. 1758).  The physician's note indicates that plaintiff "refuse[d] Motrin & all other NSAIDs" and that he gave plaintiff Lortab.  (R. 1751, 1753, 1756, 1758, 1760).  Plaintiff returned to Baptist ER on February 23, 2007 complaining of a toothache.  He received a prescription for Lortab.  (R. 1742, 1740-49).  On March 14,

2007, he sought treatment at the VAMC emergency department in Montgomery for swelling

and pain in his left lower leg. The ER physician, Dr. Martin, noted plaintiff's narcotic

medications – she wrote "Morphine 60 mg – 90 tabs given on 2/21" and Lortabs 10 mg – 90

tabs given 2/12/ , ?90 on 2/26/ and 90 more scheduled to be mailed on 3/18."  (R. 1892-93).

She further observed:

> As this is probably not acute – no clinical evidence of DVT or any life
> threatening illness.  Probable old seroma. Offered Motrin for any possible
> inflammatory component this evening, get stat lab work now. Allow him to
> catch the bus for Hoptel. I will follow up with the doctor on East Campus
> tonight.  We will then get xray and a surgical consult on tomorrow.  He rejected
> all of this refused the offer and Toradol.
>
> He stated that he would just have it checked at Tuskegee. The amount of
> narcotic analgesic that this Pt is receiving really needs to be reevaluated.

(R. 1893).

On the morning of March 16, 2007, plaintiff went to the VAMC primary care clinic,

complaining of left leg swelling and pain. He reported that "he was seen on 3/14/07 in

Montgomery ER but stated he left because he 'did not want the Motrin.'" He also stated that

his medication had been stolen recently. The primary care physician offered him a Toradol

injection, but plaintiff again refused it.  (R. 1879-80, 1885-87).  Later that same day, plaintiff

went to the ER at Baptist Hospital, seeking treatment for his leg pain.  He had a small abscess

on his leg, which a nurse practitioner cleaned and packed.  The physician prescribed Lortab.

(R. 1728-39).  Two days later, plaintiff returned to the Baptist ER, complaining of an allergic

reaction to Bactrim. His leg wound was repacked and injected with Lidocaine. Plaintiff

received a prescription for Tylox.  (R. 1716-27).  On April 3, 2007, plaintiff saw a VA

orthopedic surgeon who concluded that plaintiff had "findings of an acute episode of osteo

lt tibia in remission.  X-rays neg for any active disease."  The physician did not prescribe

additional narcotic medication.  (R. 1877).  On April 7, 2007, plaintiff reported to the Baptist

ER complaining of pain after he lost a stitch following a tooth extraction. He received another

prescription for Lortab.  (R. 1698-1706).  Six days later, on April 13, 2007, plaintiff returned

to the Baptist ER, complaining of pain from the wound on his left lower leg.  Morphine was

administered in the ER, and plaintiff got another prescription for Lortab.  (R. 1686-97).  On

April 18, 2007, plaintiff returned to the Baptist ER, complaining of continued pain from the

wound on his left leg.  He received prescriptions for Lortab and Vicodin.  (R. 1674-85).  He

returned for a recheck of his wound three days later, complaining of continued pain and

swelling; he received prescriptions for Ultram and Lortab.  (R. 1666-73).

On April 30, 2007, plaintiff had corrective surgery at the VAMC for a bunion and

"hammer-toes" on his left foot.  (R. 1836-57).  On discharge, the physician prescribed an

additional narcotic, Percocet, for plaintiff to take for "break-through pain."  Plaintiff was

scheduled for follow-up at the Maxwell Podiatry Clinic on May 9, 2007. (R. 1845).  On May

4, 2007, plaintiff went to the Baptist ER, reporting that he had foot surgery on Monday and

that someone had stepped on the surgical site earlier that day.  The ER physician prescribed

Ultram and Tylox.  (R. 1656-65).  On May 8, 2007, plaintiff went to the podiatry clinic at the

VA.  He stated that he had an appointment for the following day at Maxwell but that he "had

to be seen today" because someone had stepped on his foot and he had increased pain. The

podiatrist, Dr. Goldman, determined that the surgical hardware and sutures were intact and

there was no new osseous pathology. He noted bruising on the side of plaintiff's foot. He observed that plaintiff was "currently taking Lortab 5 as base pain medication" and he renewed plaintiff's prescription for Percocet, giving him forty 5 mg pills to be taken one every four to six hours.  He wrote, "Patient informed this is the last Perco[c]et rx he will rec[ei]ve from this clinic for this post-operative condition."  He scheduled plaintiff for follow-up at Maxwell in one week.  (R. 1835).

Plaintiff returned to the Baptist ER on the evening of May 11, 2007, complaining of a migraine "since this AM."  (R. 1654).  He left without being seen.  (R. 1655).  He returned the following morning, on May 12, 2007, and complained of a headache that began "2 days ago."  (R. 1650).  He reported that he had a migraine that started after he got some "bad news," and he requested pain and sleeping pills. (R. 1646).  He received a prescription for Percocet. (R. 1645).  Four days later, plaintiff returned to the VA outpatient podiatry clinic, reporting continued pain in his left foot.  He was seen by a podiatry resident and by a podiatrist, Dr. Agee. The treatment note indicates that plaintiff received an additional prescription for Percocet for "breakthrough pain," and that he was advised, again, that "he will not be given any more prescriptions for Percocet."  (R. 1833).

On May 18, 2007, plaintiff's prescription for morphine was renewed, and he received ninety 60 mg tablets.  (R. 1829).  Plaintiff had filled his morphine and Lortab prescriptions on a monthly basis at the VAMC throughout the first part of 2007, as the ALJ noted.  (See R. 1834, 1869, 1888, 1883, 1893, 1907, 1908, 1915, 1927, 1928).  Additionally, on each of the occasions on which he sought treatment at the Baptist Hospital ER in early 2007, plaintiff

reported that he had no primary care provider or "family doctor." (R. 1643, 1652, 1656, 1666, 1670, 1674, 1679, 1686, 1691, 1698, 1703, 1707, 1711, 1728, 1734, 1740, 1745; see also R. 1716, 1721, 1749, 1754 ("family doctor" space on triage form left blank on two visits, but ER admissions summaries reflected "NO[]PCP" in block labeled "Primary Care Physician")).[8] The reasons articulated by the ALJ for declining to credit plaintiff's testimony regarding the severity and frequency of his headaches fully are adequate and supported by substantial evidence of record.

## CONCLUSION

Upon review of the record as a whole, the court rejects plaintiff's argument that the ALJ committed reversible error in applying the Eleventh Circuit pain standard. The decision of the Commissioner is, accordingly, due to be AFFIRMED. A separate judgment will be entered.

---

[8] Plaintiff argues that, aside from his two "incorrect conclusions, the ALJ never explained why Mr. Lacy, with his long history of migraine headaches, as supported by his treatment notes (e.g., Tr. 2008-09), a consultative examination (Tr. 2040) and the medical expert's testimony (Tr. 2207), cannot suffer migraine headaches in the manner he described." (Doc. # 12, p. 14). The ALJ concluded that plaintiff has a severe impairment of "headaches." (R. 19). The evidence cited by plaintiff includes a VA list dated in 2006 of plaintiff's medications (including Esgic) and of all of his various diagnoses (including "Migraine") and the medical expert's testimony that plaintiff has "migraine headaches" and other conditions (R. 2207). In the August 2007 consultative examination on which plaintiff relies, Dr. Colley diagnosed "[c]hronic tension headaches." (R. 2040). During that examination, plaintiff stated that he "has been told that [his] headaches are tension headaches, a variety of migraine headaches." (R. 2033). Plaintiff told Dr. Colley that the headaches occur "1-3 times per month and last for hours, occasionally improved with Excedrin," and that he "has been to the emergency room several times with his headaches, and each time he has told them that Demerol does not help; 'what works for me is Ambien and two oxycodone tablets.'" (R. 2033-34). Plaintiff reported nausea associated with the headaches, but denied symptoms of photophobia or phonophobia. (R. 2033). Whether the impairment is identified as "headaches" or "migraine headaches," the ALJ found it to be severe. As he was required to do, he analyzed the evidence of symptoms resulting from the impairment. The diagnoses of "migraine headaches" do not impeach the ALJ's stated reasons for discounting plaintiff's testimony regarding the severity and frequency of his headaches and they do not deprive the ALJ's credibility determination of substantial evidentiary support.

DONE, this 28th day of February, 2012.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE